IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AUGUSTUS SIMMONS, | ) | Case No. 1:18-cv-201 Erie |
| | ) | |
| Plaintiff | ) | |
| v. | ) | RICHARD A. LANZILLO |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| MICHAEL OVERMYER, et al., | ) | |
| | ) | ORDER ON DEFENDANTS' MOTION |
| Defendants | ) | TO DISMISS [ECF NO. 31] |
| | ) | |

I.    Introduction

Plaintiff Augustus Simmons, an inmate in the custody of the Pennsylvania Department of
Corrections, initiated this pro se action on July 6, 2018, pursuant to 28 U.S.C. § 1983. ECF No.
1. In his Amended Complaint, Simmons asserts nine counts for relief against officials at the
State Correctional Institution at Forest (SCI-Forest)[1] based on alleged violations of the Religious
Land Use and Institutionalized Persons Act and the First, Eighth, and Fourteenth Amendments to
the Constitution. ECF No. 25. Simmons names the following individuals as Defendants:
Facility Manager Michael Overmyer, Major Blicha, Unit Manager Lee, Lt. Wonderling, Lt.
Dietrich, Sgt. Mravintz, PSS Sheesly, Grievance Coordinator Reeher, and Correctional Officers
Kundick, Coleman, Weiss, Newark, and Ellenberger. Simmons seeks both compensatory
damages and injunctive relief.

On May 14, 2019, Defendants moved to dismiss for failure to state a claim pursuant to
Federal Rule of Civil Procedure 12(b)(6). ECF No. 31. Because Defendants attached several
exhibits to their motion, the Court instructed Simmons that the motion "may be treated, either in
whole or in part, as a motion for summary judgment under Federal Rule of Civil Procedure 56."

---

[1] Simmons has since been transferred to SCI-Coal Township.

ECF No. 33 (citing *Renchenski v. Williams*, 622 F.3d 315 (3d Cir. 2010)). Simmons responded to the motion to dismiss on June 28, 2019. ECF No. 36. As a result, this matter is ripe for disposition.[2]

## II. Factual Background

On or about November 6, 2017, the Pennsylvania Department of Corrections (DOC) transferred Simmons from SCI-Greene to SCI-Forest and assigned him to the Restricted Housing Unit (RHU) and the Security Threat Group Management Unit (STGMU).[3] Simmons, a former gang member, adheres to a self-created religion known as "the fellowship of spiritual science." ECF No. 25 ¶¶ 16-17. According to Simmons, "[i]t is a mandatory requirement in the fellowship of spiritual science to read historical, philosophical, scientific and spiritual books." *Id.* ¶ 15.

Shortly after arriving at SCI-Forest, Kundick stopped at Simmons' cell door and claimed to have searched Simmons' legal property and discovered Simmons' prior lawsuit against officials at SCI-Greene. ECF No. 25 ¶ 4. Kundick warned Simmons to "get with the program" if he ever wanted to get out of the RHU. *Id.* ¶ 5. When Simmons objected, Kundick loudly accused Simmons of being a "snitch" and a "rat," knowing that such accusations would place Simmons in danger from other prisoners "due to the 'street code' of no snitching." *Id.*

Around that same time, Weiss and Coleman conducted an inventory of Simmons' property. *Id.* ¶ 14. Simmons noticed that several books were missing including world history books, a philosophical dictionary of quotations, and various self-help and science books. *Id.* ¶¶ 15-16. When Simmons complained that these books were essential to his religion, Weiss

---

[2] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge to conduct all proceedings in this case, including the entry of final judgment, as authorized by 28 U.S.C. § 636.

[3] The STGMU at SCI-Forest "is a non-punitive program" designed for "inmates who have poor prison adjustment, numerous misconducts, and/or known gang affiliations." *Imes v. Wingard*, 2017 WL 1400143, at *2 (W.D. Pa. Feb. 21, 2017).

accused Simmons of creating a "fake religion" and stated: "we don't care about your spiritual science or your rights dude, just give that up, get with our program and act like a blood man." *Id.* ¶ 17. Coleman added that Simmons could have his property back if he would "lay down and not file any more grievances." *Id.* ¶ 18. When Simmons refused Coleman's "deal," Coleman and Weiss refused to inventory Simmons' property and deprived him of his books for almost two months. *Id.* ¶¶ 19-20.[4]

On November 16, 2017, several staff members conducted an investigative cell search of Simmons' cell. *Id.* ¶ 7. After "trashing" his cell, one of the officers told Simmons to "take it up with Kundick, he's the one that got us down here." *Id.* ¶ 8. Kundick later told Simmons that he would make his life in the STGMU "hell" and stated: "Check the computer Simmons, I'm undefeated in the Courts, Kundick never loses. So do all the crying you want, [we'll] win and you'll los[e], rat!" *Id.* ¶ 9.

Several months later, Simmons sustained a back injury when correctional officer Newark forced him to walk to the recreational yard in a dangerous manner. *Id.* ¶ 50. According to Simmons, when inmates forget to untie their boots after visiting the recreational yard, staff members at SCI-Forest refuse to allow inmates to untie them before the next time they leave their cells. *Id.* ¶ 46. Instead, they require them to "wear their boots with only their toes barely in the boots," forcing them to "hop" and "wobble" around for the amusement of staff. *Id.* ¶ 46. Such was the case on February 18, 2018, when Simmons forgot to untie his boots, a mistake he attributes to short-term memory loss. *Id.* ¶¶ 48-49. Rather than allow Simmons to untie them, Newark ordered: "wear the boots or get burned for yard, nobody told you to leave them tied like

---

[4] At paragraphs 22-44 of his amended complaint, Simmons accuses Weiss, Coleman and Ellenberger of conducting improper strip searches and denying him access to his legal materials and the law library because of his litigation and grievance history. Because Defendants do not discuss these allegations in their motion to dismiss, it appears that they are not seeking dismissal of those claims and the Court will not address them here.

this." *Id.* ¶ 49. Because he didn't want to miss yard, Simmons put his toes into the tied boots and "tried to wobble and walk" but "tripped and fell face first," banging his head and body on the concrete floor. *Id.* ¶ 50.

Simmons next presents several allegations against Unit Manager Lee. First, Lee demoted Simmons within the STGMU program in response to misconducts that Simmons had not yet had a chance to challenge. By way of background, the STGMU program at SCI-Forest "encompasses five steps or phases and each phase offers progressively more privileges and services." *Imes*, 2017 WL 1400143, at *2. Inmates in the STGMU program begin at Phase 5 and progress to Phase 1, at which point they may reintegrate into the general prison population. *Id.* Lee twice demoted Simmons to a lower phase based on a misconduct that Simmons intended to contest at a hearing. ECF No. 25 ¶¶ 54-55. Simmons contends that this deprived him of due process of law. *Id.* ¶ 56.

Next, Lee deprived Simmons of his legal paperwork and access to the law library in retaliation for his extensive grievance history. *Id.* ¶¶ 57-66. Specifically, Simmons had several legal exemptions (i.e., approvals to keep extra legal paperwork in his cell or swap boxes of legal materials) which Lee ignored or obstructed. *Id.*

Simmons next contends that the conditions of confinement in the STGMU program amounted to cruel and unusual punishment. He maintains that Sheesly, a mental health specialist, subjected him to "psychological torture" throughout his tenure in the STGMU by depriving him of yard, group activities, therapeutic journals and activities, television programming, and access to friends and family. *Id.* ¶ 74. Sheesly also ignored Simmons when he threatened to kill himself and refused to monitor the mental health implications stemming from Simmons' long-term confinement in solitary. *Id.* ¶ 76. As a result, Simmons suffers from

4

night terrors, sleep disorders, excessive weight loss, and episodes of anxiety and post-traumatic stress disorder. *Id.*

On December 12, 2019, Simmons filed a request to his grievance coordinator asking why he had not received appeal decisions for several of his grievances. *Id.* ¶ 79. Simmons determined that Grievance Coordinator Reeher "withheld numerous grievances . . . and grievance appeals in an attempt to thwart" Simmons from filing lawsuits. *Id.* ¶ 81. Reeher later "lied on an official document and conspired with Unit Manager Lee" to deny and thwart Simmons' grievances. *Id.* ¶ 83. Finally, Reeher advised Simmons that his "constant manipulative and obstructive behavior [with respect to grievances] only increase[d] the risk of desensitizing staff." *Id.* ¶ 85. Simmons construed this language as a retaliatory threat. *Id.*

Simmons asserts a supervisory liability claim against Overmyer, Wonderling, Dietrich, Lee, Blich, and Mravintz based on their failure to "stop, prevent, investigate or reform, protect, separate and or halt any bad acts that violated [his] U.S. Constitutional rights." *Id.* at p. 24. Simmons contends that each of these supervisory defendants "had notice of the bad acts of correctional staff named in this action" but failed to prevent those acts. *Id.* ¶ 92. Defendants also ignored the "vast amount of request slips and grievances" that he sent. *Id.*

Lastly, Simmons accuses Ellenberger, Coleman, and Mravintz of retaliating against him for acting as a witness for another inmate who had filed a sexual harassment complaint against Mravintz. *Id.* ¶ 94. Defendants' retaliatory conduct included verbal threats, "aggressive and unethical strip searches," and trashing his cell. *Id.* ¶¶ 95-96.

II.     Standards of Review

A. Pro se Litigants

Pro se pleadings, "however inartfully pleaded," are held to "less stringent standards than

formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520-521 (1972). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. *Boag v. MacDougall*, 454 U.S. 364 (1982); *United States ex rel. Montgomery v. Bierley*, 141 F.2d 552, 555 (3d Cir. 1969) (petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"). Under our liberal pleading rules, during the initial stages of litigation, a district court should construe all allegations in a complaint in favor of the complainant. *Gibbs v. Roman*, 116 F.3d 83 (3d Cir. 1997).

B. Motion to dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, the plaintiff must only present factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)). *See also Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). A complaint should only be dismissed pursuant to Rule 12 (b)(6) if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 (rejecting the traditional 12 (b)(6) standard established in *Conley v. Gibson*, 355 U.S. 41 (1957)). In making this determination, the court must accept as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

While a complaint does not need detailed factual allegations to survive a motion to dismiss, a complaint must provide more than labels and conclusions. *Twombly*, 550 U.S. at 555. A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). Moreover, a court need not accept inferences drawn by a plaintiff if they are unsupported by the facts in the complaint. *See California Pub. Employee Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the Court accept legal conclusions disguised as factual allegations. *Twombly*, 550 U.S. at 555 (citing *Papasan*, 478 U.S. at 286). *See also McTernan v. City of York, Pennsylvania*, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Expounding on the *Twombly/Iqbal* line of cases, the Third Circuit has articulated the following three-step approach:

> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)). This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

C. Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must to go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

III.    Analysis

    A. Exhaustion

Before addressing the substance of Simmons' allegations, Defendants contend that two of Simmons' claims – the retaliation claim raised in Count One and parts of the retaliation claim raised in Count Two – should be dismissed for lack of exhaustion. The Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a) (the "PLRA"), requires a prisoner to exhaust any available administrative remedies before he may bring an action pursuant to 42 U.S.C. § 1983 challenging the conditions of his confinement. 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all claims relating to prison life which do not implicate the duration of the prisoner's sentence. *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Further, the statute requires "proper exhaustion," meaning that a prisoner's completion of the administrative review process must also satisfy the applicable procedural rules of the prison's grievance system. *Fennell v. Cambria County Prison*, 607 Fed. Appx. 145, 149 (3d Cir. 2015). Failure to exhaust administrative remedies under the PLRA is an affirmative defense that must be pleaded and proven by defendants. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).

The exhaustion requirement "admits of one, narrowly defined exception." *Williamson v. Roberts*, 2013 WL 967693, at *4 (W.D. Pa. Mar. 12, 2013). Courts have "invariably held" that "affirmative misconduct by prison officials, designed to impede or prevent an inmate's attempts to exhaust, may render administrative remedies unavailable." *Payne v. Gordon*, 2018 WL 3649025, at *5 (M.D. Pa. Aug. 1, 2018) (citing *Todd v. Benning*, 173 Fed. Appx. 980, 982-83 (3d Cir. 2006)). Thus, if the actions of a prison official directly and affirmatively cause an inmate to procedurally default his grievance, the inmate will not be held to strict compliance with the exhaustion requirement. *See Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000) (Section

1997e(a) only requires that prisoners exhaust such administrative remedies "as are available");
*McKinney v. Guthrie*, 309 Fed. Appx. 586 (3d Cir. 2009) ("An administrative remedy may be
unavailable if a prisoner is prevented by prison authorities from pursuing the prison process.").
Examples of affirmative misconduct include, inter alia, threatening a prisoner to thwart
exhaustion and/or refusing to provide appropriate grievance forms in response to an inmate's
inquiry. *See, e.g., Harcum v. Shaffer*, 2007 WL 4167161, at *5 (E.D. Pa. Nov. 21, 2007)
(finding administrative remedies unavailable where prison officials threatened plaintiff with
"opposition to his future prerelease application, parole, or outside work detail if he did not
withdraw his grievance"); *Mitchell v. Horn*, 318 F3d 523, 529 (3d Cir. 2003) (exhaustion may be
excused where "prison officials denied [an inmate] the necessary grievance forms and, as a
result, he lacked 'available' administrative remedies.").

Defendants have submitted several exhibits suggesting that Simmons failed to exhaust his
retaliation claim against correctional officer Kundick and portions of his retaliation claim against
Coleman, Weiss and Ellenburger. Simmons' amended complaint, however, alleges that prison
officials obstructed his access to the grievance procedure in various ways. These include
allegations that prison officials stole, destroyed, ignored, or belatedly responded to many of his
grievances, directly and affirmatively impeding Simmons' ability to exhaust his administrative
remedies. Given these allegations, which must be accepted as true at this stage in the
proceedings, Defendants' request for dismissal based on exhaustion is denied.

### B. RLUIPA claims

Although not independently enumerated as one of Simmons' nine causes of action,
Simmons references the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42
U.S.C. § 2000cc, *et seq.*, throughout his pleading. In broad brush, the RLUIPA prohibits the

government from imposing a "substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability." *Washington v. Klem*, 497 F.3d 272, 277 (3d Cir. 2007) (quoting 42 U.S.C. § 2000cc-1(a)). A "substantial burden" exists where: "(1) A follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Id.* at 280.

Simmons contends that it is "a mandatory precept" within his religion "for all followers to express, and practice the religious precept known as the Eye of Odysseus which requires the plaintiff to study historical, philosophical, scientific and spiritual books, research and documents to understand if something being studied or examined is unfounded or founded in facts or theory." ECF No. 37 at 5. Simmons asserts that several Defendants – in particular, Weiss, Coleman, and Ellenberger – forced him to abandon this precept by refusing to allow him to access his religious books and documents and by limiting his choice of religious literature to a "Bible, Qu'ran, or Buddhist book." *Id.* at 6.

Before reaching the merits of this allegation, the Court notes that Simmons cannot recover compensatory or punitive damages under the RLUIPA. In *Sharp v. Johnson*, 669 F.3d 144, 154 (3d Cir. 2012), the Court of Appeals for the Third Circuit held that the RLUIPA does not permit actions against government employees in their individual capacities. To the extent that Simmons may be pursuing his claims against the Defendants in their official capacities, the Eleventh Amendment bars the recovery of monetary damages. *Scott v. Beard*, 252 Fed. Appx. 491 (3d Cir. 2007) (holding that RLUIPA claims for money damages against a Pennsylvania

state official in his official capacity are barred by the Eleventh Amendment). In tandem, these principles restrict Simmons claims under the RLUIPA to injunctive and declaratory relief.

A review of his amended complaint reveals that Simmons is seeking the following as injunctive relief: termination of every staff member identified in his pleading; transfer to another state correctional institution; investigation of STGMU policy by the governor's office; the addition of permanent dayrooms and group activities to the STGMU; the development of a policy for television use throughout the DOC; reforms to the guidelines by which active gang members are identified; and for Simmons' security threat group identification to be removed from his DOC file. ECF No. 25 at pp. 28-29. None of these forms of relief relate to his religious claims. Thus, to the extent that any Defendants substantially burdened the exercise of his religion, Simmons has not requested any available relief. His RLUIPA claim must be dismissed on this basis.[5]

C. Retaliation claims (Counts One, Two, Five, Seven and Nine)

Simmons' amended complaint contains several discrete allegations of retaliation. In order to state a claim for unlawful retaliation, Simmons must allege that: (1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take the adverse action. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (citing *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001)). An "adverse action" is one that would "deter a person of ordinary firmness" from exercising his First Amendment rights. *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir.

---

[5] The Court also notes that the DOC transferred Simmons to SCI-Coal Township on December 4, 2019. "An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims." *Banks v. Beard*, 2013 WL 5465165, at *8 (M.D. Pa. Sept. 30, 2013) (citing *Abdul–Akbar v. Watson*, 4 F.3d 195, 197 (3d Cir. 1993)).

2000)). Retaliatory motive can be inferred from either: (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action; or (2) a pattern of antagonism coupled with timing that suggests a causal link. *Id.* (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

### 1. Correctional officer Kundick (Count One)

Simmons contends that Kundick loudly accused him of being a snitch and a rat in front of other inmates immediately after learning that Simmons had initiated a lawsuit against his previous correctional institution. Filing lawsuits and grievances is an activity protected by the First Amendment. *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003). "[B]eing publicly referred to as a 'snitch' . . . is an adverse consequence sufficient to state a claim for retaliation." *Bracey v. Link*, 2019 WL 251853, at *6 (E.D. Pa. Jan. 16, 2019) (citing *Miller v. Leathers*, 913 F.2d 1085, 1088 at n. * (4th Cir. 1990) ("It is impossible to minimize the possible consequences to a prisoner of being labelled a 'snitch.'")). Accordingly, the Court finds that Plaintiff has alleged enough facts to plausibly support a First Amendment retaliation claim against Kundick. Defendants' motion to dismiss Count One is denied.

### 2. Coleman, Weiss and Ellenburger (Count Two)

Simmons contends that Weiss and Coleman intentionally deprived him of his religious materials for several months after Simmons refused to agree to stop filing grievances. He also alleges that Coleman, Weiss, and Ellenburger denied him access to his legal materials and the law library and utilized aggressive and unnecessary strip searches because of his "frivolous grievances." ECF No. 25 ¶ 30. Finally, he alleges that Ellenburger wrote a false misconduct. *Id.* ¶ 42. Each of these actions could deter an inmate of ordinary firmness from exercising his constitutional rights. *See, e.g., Bailey v. Jurnak*, 2019 WL 2488035, at *4 (M.D. Pa. Jan. 3,

2019) (denial of property may amount to an adverse action); *Fennell v. Horvath*, 2019 WL 1981403, at \*14 (E.D. Pa. May 3, 2019) (plaintiff's allegation that he was strip searched in retaliation for filing a lawsuit was sufficient to survive a motion to dismiss); *Palmore v. Hornberger*, 2019 WL 5073672, at \*4 (W.D. Pa. July 8, 2019) (issuing an allegedly false misconduct "could deter a reasonably firm prisoner from exercising his First Amendment rights and is adequate for purposes of the de minimus showing required to demonstrate adverse action"); *Williams v. Folino*, 2015 WL 1212951, at \*9 (W.D. Pa. Mar. 17, 2015) (allegation that plaintiff was denied law library time in retaliation for his grievance history was sufficient to state a claim). Defendants' motion to dismiss this claim will be denied.

### 3. Lee (Count Five)

As with Coleman, Weiss, and Ellenburger, Simmons maintains that Lee engaged in unlawful retaliation by depriving him of his legal paperwork and access to the law library in response to his extensive grievance history. Simmons further alleges that Lee obstructed or ignored his pre-approved requests to exchange boxes of legal documents, depriving him of necessary litigation materials. As noted above, deprivations of personal property or legal materials can amount to an adverse action under appropriate factual circumstances. *Williams*, 2015 WL 1212951, at \*9; *Bailey*, 2019 WL 2488035, at \*4. At this stage in the proceedings, Defendants' motion to dismiss must be denied.[6]

---

[6] To the extent that Simmons might have intended to assert an access to courts claim based on this same conduct, that claim would fail. To establish a violation of the right to access the courts, an inmate must show that prison officials caused an actual injury by preventing him from litigating a non-frivolous and arguable underlying claim. *Lewis v. Casey*, 518 U.S. 343, 351 (1996); *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). Simmons has alleged no facts suggesting that this was the case.

### 4. Reeher (Count Seven)

Simmons alleges that Reeher lied on official documents and refused to process his grievance. Because "[a]ccess to prison grievance procedures is not a constitutionally-mandated right," allegations of improprieties in the handling of grievances are not ordinarily cognizable under § 1983. *Williams v. Armstrong*, 566 Fed. Appx. 108-09 (3d Cir. 2014). Here, however, Simmons alleges that the failure to process his grievances represented unlawful retaliation in response to his protected activity of filing grievances and lawsuits. Such allegations suffice to state a claim for retaliation. *Williams v. Pa. Dept. of Corr.*, 2019 WL 3334345, at *1 (W.D. Pa. July 25, 2019) (dismissing due process claims based on defendant's failure to process a grievance but declining to dismiss retaliation claim based on the same incident). As such, Defendants' motion to dismiss this claim must be denied.

### 5. Ellenburger, Coleman, and Mravitz (Count Nine)

Simmons' final retaliation claim targets Ellenburger, Coleman, and Mravitz. Simmons contends that each of these Defendants retaliated against him for serving as a witness during another inmate's sexual harassment investigation. This retaliation included "aggressive and unethical strip searches," trashing his cell, and denying him the ability to access the law library or his legal materials. ECF No. 25 ¶¶ 95-98. Because each of these actions could deter an inmate of ordinary firmness from exercising his constitutional rights, Defendants' motion to dismiss this claim must be denied. *Bailey*, 2019 WL 2488035, at *4 (denial of property); *Fennell*, 2019 WL 1981403, at *14 (retaliatory strip search); *Williams*, 2015 WL 1212951, at *9 (denial of access to the law library); *Coit v Garman*, 2019 WL 2612703, at *8-9 (M.D. Pa. June 26, 2019) (noting that excessive cell searches may constitute adverse actions).

D.  Deliberate indifference (Count Three)

Simmons alleges that Newark and Mravintz acted with deliberate indifference to his health and safety by forcing him and other inmates to "wobble" around the prison with only the tips of their toes in their boots while officers laughed and joked.  On one occasion, Simmons tripped and injured his back because Newark forced him to walk in this manner with his hands cuffed behind his back.

To establish a violation based on deliberate indifference, Simmons must allege that Defendants had actual knowledge of "an excessive risk to inmate health or safety" and were deliberately indifferent to the risk.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Beers-Capitol v. Wetzel*, 256 F.3d 120, 125 (3d Cir. 2001).  Deliberate indifference is a subjective inquiry, while risk of harm is evaluated objectively.  *Atkinson v. Taylor*, 316 F.3d 257, 262 (3d Cir. 2003).  Critically, the Eighth Amendment's prohibition of cruel and unusual punishment does not only restrain affirmative conduct, such as the use of excessive force against prisoners.  *Beenick v. Lefebvre*, 2016 WL 5402249, at *9 (M.D. Pa. July 29, 2016).  It also imposes a duty on prison officials to provide humane conditions of confinement and "take reasonable measures to guarantee the safety of inmates."  *Id.* (citing *Farmer*, 511 U.S. at 832).

Here, Defendants characterize the injury suffered by Simmons as mere negligence, "which is not cognizable in the context of a § 1983 action."  ECF No. 32 at 9.  This argument ignores Simmons' allegation that Newark and Mravintz (as well as other officers) intentionally forced Simmons and other inmates to walk in an objectively unsafe manner for their amusement.  At this stage in the proceedings, these allegations suffice to state a claim for deliberate indifference.  Defendants' motion must be denied.

E.  Conditions of confinement (Count Six)

Simmons next challenges the "cruel, hostile, and solitary environment" of the STGMU. ECF No. 25 ¶ 77. Simmons complains that inmates in the STGMU are given no opportunity to recreate in a group and are deprived of "therapeutic journals," "daily T.V. programming," and kiosks to email family and friends. *Id.* ¶ 74.

"Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, . . . only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).   An Eighth Amendment conditions of confinement claim exists where "viewing the totality of the conditions in the prison, the inmate's conditions of confinement, alone or in combination, deprive him of the minimal civilized measure of life's necessities." *Tillery v. Owens*, 907 F.2d 418, 426-27 (3d Cir. 1990).  In the non-medical context, this means that prison officials must provide adequate food, clothing, shelter, and medical care, and "take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).

Courts in this Circuit have repeatedly rejected conditions of confinement claims based on conditions in the STGMU. *Robinson Noble v. Wetzel*, 2019 WL 4279975, at *5-6 (W.D. Pa. Aug. 1, 2019); *Imes*, 2017 WL 1400143, at *6 (placement in the STGMU did not result in the denial of any basic human need).  Simply put, the typical conditions in the STGMU do not amount to a deprivation of food, clothing, shelter, medical care, or safety.  To the extent that Simmons is asserting a stand-along conditions of confinement claim based on conditions in the STGMU, that claim is dismissed.

### F. Deliberate indifference (Count Six)

In addition to challenging the underlying conditions in the STGMU, Simmons maintains that Sheesly, a mental health specialist, displayed deliberate indifference to the "psychological torture" he experienced while in the STGMU. "[D]eliberate indifference" occurs when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Here, Simmons alleges that he raised his mental health concerns with Sheesly daily but she "[stood] by and [did] nothing to assist [him]." ECF No. 25 ¶ 76. Simmons also asserts that Sheesly received a report stating that Simmons was going to kill himself with a razor and ignored it. Simmons suggests that Sheesly's neglect caused him to experience worsening night terrors, sleep disorders, excessive weight loss, and episodes of anxiety and post-traumatic stress disorder. At this stage in the litigation, these allegations are enough to survive dismissal.

### G. Due process claim (Count Four)

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). In analyzing a procedural due process claim, "the first step is to determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000). A protected liberty interest arises only where a restraint "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Williams v. Secretary Pennsylvania Dep't of*

*Corrections*, 848 F.3d 549, 558-59 (3d Cir. 2017) (emphasis and citations omitted). If the asserted interest falls within the protections of the Due Process Clause, the second step is to determine whether the plaintiff was afforded "all of the process he was due." *Shoat*, 213 F.3d at 143.

Simmons' due process claim fails at the first step. Courts in the Third Circuit, including the Court of Appeals, have consistently held that placement in the STGMU does not implicate a liberty interest. *See, e.g., Imes*, 2017 WL 1400143, at *5 (concluding that placement in the STGMU at SCI-Forest did not "impose[] an atypical and significant hardship . . . relative to the ordinary incidents of prison life" and, therefore, did not implicate a protected liberty interest); *Harris v. Ricci*, 595 Fed. Appx. 128, 131 (3d Cir. 2014) (concluding that the New Jersey STGMU, a much stricter program than the STGMU at SCI-Forest, did not implicate a liberty interest). In the absence of a protected liberty interest, Simmons cannot establish a violation of his due process rights and dismissal is warranted.

H. Supervisory Liability (Count Eight)

Finally, Simmons asserts a "supervisory liability" claim against Overmyer, Wonderling, Dietrich, and Blicha based on their failure to correct the violations highlighted in his amended complaint or adequately respond to his grievances.[7] Simmons broadly alleges that each of these Defendants "had notice of the bad acts of correctional staff named in this action but did little to nothing, or even conspired and aided in the actions of staff in the STGMU. Plaintiff filed a vast amount of request slips and grievances and none of the above supervisors responded within their supervisor capacity." ECF No. 25 ¶ 92.

---

[7] Because Simmons has asserted several viable claims against Lee based on his direct role in several alleged violations, the Court excludes Lee from this analysis.

To prevail on a § 1983 claim, a plaintiff "must show that each and every defendant was 'personal[ly] involve[d]' in depriving him of his rights." *Kirk v. Roan*, 2006 WL 2645154, at *3 (M.D. Pa. 2006) (quoting *Evancho v. Fischer*, 423 F.3d 347, 353 (3d Cir. 2006)). This means that each defendant must have played an "affirmative part" in the complained-of misconduct. *Iqbal*, 556 U.S. at 677 ("In a § 1983 suit ... [a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

These principles apply with equal force where the defendants are supervising prison officials. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998) (noting that liability for supervisory officials must still be based on "personal involvement in the alleged wrongs"). Although a supervisor cannot encourage constitutional violations, "a supervising public official has [no] affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates." *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir. 1986); *Brown v. Grabowski*, 922 F.2d 1097, 1120 (3d Cir. 1990). Nor can Section 1983 liability be predicated solely on the theory of *respondeat superior*. *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1293-95 (3d Cir. 1997).

Finally, it is "well established that the filing of a grievance is not sufficient to show the actual knowledge necessary for a defendant to be found personally involved in the alleged unlawful conduct." *Mearin v. Swartz*, 951 F.Supp.2d 776, 782 (W.D. Pa. 2013). *See also Mincy v. Chmielsewski*, 508 Fed. Appx. 99, 104 (3d Cir. 2013) ("[A]n officer's review of, or failure to investigate, an inmate's grievances generally does not satisfy the requisite personal involvement."). As such, courts have routinely dismissed civil rights allegations against prison officials whose only knowledge of the alleged violation stemmed from their participation in the grievance process. *See, e.g.*, *Beale v. Wetzel*, 2015 WL 2449622, at *5 (W.D. Pa. May 21, 2015)

(dismissing claims against senior prison officials because the only allegations against them arose in the context of their participation in an administrative appeal process); *Rogers v. United States*, 696 F.Supp.2d 472, 488 (W.D. Pa. 2010) ("If a grievance official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official.").

Applying these principles, Defendants maintain that each of the claims identified in Count Eight must be dismissed. The Court agrees. The allegations in Count Eight relate to Defendants' involvement in the grievance process, failure to respond to request slips, or refusal to correct violations despite "being aware" of them. Allegations that a supervisor was "made aware of several issues of the plaintiff's and . . . failed to help him" are insufficient to state a claim for relief. *Kloss v. SCI-Albion*, 2018 WL 4609144, at *4 (W.D. Pa. Aug. 15, 2018). The same is true where a supervisor merely "receives and reviews a letter or grievance appeal," *Johnson v. Wireman*, 2019 WL 1383575, at *7 (M.D. Pa. Mar. 27, 2019), or "fail[s] to act favorably on an inmate's grievance [or misconduct]," *White v. Wetzel*, 2016 WL 3197966, at *6 (W.D. Pa. June 9, 2016). Absent affirmative misconduct on the part of any of the supervisory Defendants, Simmons' claims against Overmyer, Wonderling, Dietrich, and Blicha must be dismissed.

IV. Conclusion

For the reasons stated herein, Defendants' motion to dismiss is granted in part and denied in part. Defendants' motion is GRANTED as to the following claims, each of which is dismissed, with prejudice:

(1) RLUIPA claims (Counts One, Two, Three, Five, and Eight);

(2) Due process (Count Four);

(3) Access to courts (Count Five);

(4) Conditions of confinement (Count Six); and

(5) Supervisory liability (Count Eight).

As a result of the foregoing, Defendants Overmyer, Wonderling, Dietrich, and Blicha are each dismissed from this action.

Defendants' motion is DENIED as to the following:

(1) Retaliation claim against Kundick (Count One);

(2) Retaliation claim against Coleman, Weiss, and Ellenburger (Count Two);

(3) Deliberate indifference against Newark and Mravintz (Count Three);

(4) Retaliation claim against Lee (Count Five);

(5) Deliberate indifference against Sheesly (Count Six);

(6) Retaliation against Reeher (Count Seven); and

(7) Retaliation against Ellenburger, Coleman, and Mravitz (Count Nine).

IT IS SO ORDERED.

RICHARD A. LANZILLO
United States Magistrate Judge

Dated: December 27, 2019